**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KIKO ESCLAVADA,

        Plaintiff,

                                         Case No. 02-75091

v.                                   Hon. Gerald E. Rosen

METROPOLITAN LIFE
INSURANCE COMPANY,

        Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING CROSS-MOTIONS TO REVERSE OR AFFIRM**
**ADMINISTRATOR'S DENIAL OF LONG TERM DISABILITY BENEFITS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     October 19, 2005

PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I.  INTRODUCTION

In the present suit, Plaintiff Kiko Esclavada challenges the decision of the

Defendant plan administrator, Metropolitan Life Insurance Company, to deny her claim

for long term disability benefits under a plan offered by her employer, Victoria's Secret.

This Court's subject matter jurisdiction over this case rests upon Plaintiff's claim for

benefits under an employee welfare benefit plan governed by the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

1

Presently before the Court are the parties' cross-motions to affirm or reverse Defendant's decision to deny long term disability benefits to Plaintiff. The parties agree that the "arbitrary and capricious" standard governs this Court's review of the challenged decision, although they disagree somewhat as to the degree of deference owed to Defendant under this standard. Nonetheless, Plaintiff maintains that the decision here must be overturned even under a deferential standard of review, where the physicians selected by Defendant to assess the medical record and provide their opinions about the extent of Plaintiff's disability either disregarded or were not even provided with certain key portions of this record.

The parties' cross-motions now have been fully briefed on both sides and are ready for decision. Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs," see Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan, following the guidelines set forth by the Sixth Circuit in Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 619 (6th Cir. 1998).[1] This Opinion and Order sets forth the Court's findings of fact and conclusions of law. To the extent that

---

[1]Specifically, Wilkins holds that neither summary judgment nor a bench trial provides an appropriate procedural basis for resolving ERISA actions to recover benefits. Rather, the Sixth Circuit suggested that district courts generally should review challenged benefit denials "based solely upon the administrative record, and [should] render findings of fact and conclusions of law accordingly." 150 F.3d at 619.

2

any findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II.  FINDINGS OF FACT

### A.      Plaintiff's Treatment for Panic Attacks

Plaintiff Kiko Esclavada commenced her employment with Victoria's Secret on May 22, 2001, working at one of the company's retail stores as an assistant sales manager.  As an employee of a subsidiary of The Limited, Inc., Plaintiff was enrolled in the parent company's long term disability benefit plan (the "Plan") after thirty days of employment, or on June 21, 2001.  The Plan is self-funded, and Defendant Metropolitan Life Insurance Company is the Plan's claims administrator.

On November 28, 2001, Plaintiff was seen for the first time by Dr. Sudhir Lingnurkar, a psychiatrist.  During this visit, Plaintiff complained of panic attacks and anxiety, and Dr. Lingnurkar reported that she "came to my office looking distraught, quite tearful, anxious, hopeless and helpless."  (Admin. Record at 72.)  Plaintiff further stated that she had "problems at her work," that one of her episodes of anxiety followed an argument with her supervisor, and that, in general, "things started going downhill" at work following a change of supervisors.  (Id.)  Upon speaking to Plaintiff, determining her medical history, and performing a mental status examination, Dr. Lingnurkar diagnosed Plaintiff as follows on the DSM-IV five-axis scale:

> AXIS I:      Panic disorder without agoraphobia.  Rule out major
> depression, recurrent with anxiety.
> AXIS II:     Deferred.

3

    AXIS III:    Nil.
    AXIS IV:     Moderate.
    AXIS V:      Fair.

(Id. at 73.)  Dr. Lingnurkar also established a treatment plan of one-to-one psychotherapy,

prescribed Klonopin and Paxil, and stated that "[w]e will stabilize [Plaintiff] and then

send her back to work."  (Id.)

    At a follow-up appointment on December 5, 2001, Dr. Lingnurkar reported that

Plaintiff was "still quite distraught" and "still having panic attacks."  (Id. at 74.)  Upon

recounting another problem at her work, Plaintiff was "encouraged to move to a different

location" and responded that she was "looking into that."  (Id.)  The notes from this

session indicate that Plaintiff's diagnosis remained essentially unchanged, and that Dr.

Lingnurkar determined that Plaintiff's medications should be continued as is.

    Plaintiff's last day of work for Victoria's Secret was December 23, 2001.  Three

days later, on December 26, 2001, she was seen by Dr. Lingnurkar "on an emergency

basis" and was characterized as "suffering from severe panic attacks."  (Id. at 75.)  In a

letter to Plaintiff's employer, Dr. Lingnurkar stated that he had adjusted Plaintiff's

medication and that he intended to "follow [Plaintiff] closely," and he offered the

following diagnosis:

    AXIS I:      Panic Disorder without Agorophobia
    AXIS II:     Nil
    AXIS III:    Nil
    AXIS IV:     Severe
    AXIS V:      Moderate

(Id.)  Finally, Dr. Lingnurkar advised Plaintiff's employer that "[i]t will be necessary for

her to be absent from work for at least three weeks at which time we will re-evaluate her."

(Id.)

Plaintiff was again seen the next day, December 27, 2001, for a follow-up appointment. Dr. Lingnurkar described Plaintiff as "extremely sad and distraught," as well as "anxious and irritable." (Id. at 76.) Plaintiff recounted an incident at work where "she became extremely panicky" after a manager began shouting at her, leaving her unable to drive and "frozen." (Id.) Dr. Lingnurkar increased Plaintiff's medications and diagnosed her as follows:

| | |
|---|---|
| AXIS I: | 300.01. |
| AXIS II: | Deferred. |
| AXIS III: | Nil. |
| AXIS IV: | Severe. |
| AXIS V: | Poor. |

(Id.)

Dr. Lingnurkar next saw Plaintiff on January 10, 2002, reporting that she "[s]till has panicky features." (Id. at 77.) Plaintiff stated that she had spoken to a manager at work who had "treated her pretty bad," leaving her "quite panicky," unable to speak, and feeling "tightness in her chest" and "palpitations." (Id.) Plaintiff also reported, however, that she has spoken to a district manager who was "quite sympathetic" and urged her to "continue her treatment," leaving Plaintiff feeling "somewhat relieved." (Id.) Nonetheless, Plaintiff stated that she was "not sleeping at all" and "constantly worrying about her job." (Id.) Dr. Lingnurkar continued Plaintiff's medications as is, encouraged her to use the Internet to "find out whether she can get another job," and stated that he

5

would recommend that Plaintiff "should go to a different store" if she elected to return to work at Victoria's Secret. (Id.) The doctor also reported that Plaintiff's diagnosis was unchanged from her last visit.

Plaintiff's next appointment with Dr. Lingnurkar was on February 8, 2002. Plaintiff again reported feeling "extremely anxious and panicky," and recounted a telephone call from her manager that "made her feel [a] little suspicious and guarded." (Id. at 78.) Dr. Lingnurkar adjusted Plaintiff's medication to account for her "increasing" panic attacks, discussed the possibility of breathing techniques to control Plaintiff's feelings of panic, and diagnosed Plaintiff as generally unchanged, albeit slightly improved, since her last visit. (Id.)

On February 25, 2002, Plaintiff was treated on an emergency basis at St. John Detroit Riverview Hospital. Plaintiff was found to have an irregular heartbeat, but the treating physician found "no harmful cause for your palpitations today." (Id. at 79.) Similarly, while Plaintiff reported discomfort as a result of anxiety, the doctor was unable to determine any harmful cause for these symptoms. (Id.) Plaintiff was prescribed Xanax and advised to see her doctor regularly.

Plaintiff continued to be seen by Dr. Lingnurkar over the next several months. On March 21, 2002, for example, Plaintiff informed the doctor about her recent emergency room visit, and reported that she was "feeling quite scared about this panic attack." (Id. at 101.) Dr. Lingnurkar continued Plaintiff's medications, and stated that she was "not in a position to return to work at this time." (Id.) The record also reflects that Plaintiff was

6

seen by Dr. Lingnurkar on May 3, July 25, and August 26, 2002, reporting panic attacks or similar difficulties at each visit.

**B.   The Relevant Terms of Plaintiff's Long Term Disability Benefit Plan**

As discussed in greater detail below, Plaintiff applied for disability benefits on January 10, 2002.  Under the terms of the disability benefit plan offered by her employer, Plaintiff was eligible for short term disability benefits beginning on the eighth day of her absence from work, with long term disability benefits then commencing on the thirty-first day of her disability.  To receive long term disability benefits under the Plan, Plaintiff must have been "under a doctor's care and . . . certified as being unable to perform all duties related to [her] job."  (Summary Plan Description, Admin. Record at 42.)

Defendant's role as claims administrator for the Plan is defined in an Administrative Services Agreement ("ASA") executed by Defendant and The Limited, Inc. as plan administrator and sponsor.  This agreement provides in pertinent part that Defendant has been "delegated [and] has agreed to assume responsibility and discretionary authority for determining eligibility for disability benefits and for construing Plan terms subject to review by the Named ERISA Claim Review Fiduciary."  (ASA at 6, Admin. Record at 12.)  In this role, Defendant is responsible for "conduct[ing] an initial evaluation of Claims to determine whether disability benefits are payable."  (Id.)  In addition, "[w]hen deemed appropriate" by Defendant, the evaluation of claims "will include review by medical professionals employed or retained by" Defendant.  (Id.)

While Defendant's initial benefit determinations are subject to review by a "Claim

7

Review Fiduciary," the ASA further provides that Defendant itself also serves in this role:

> Customer, Plan Administrator and MetLife acknowledge that Customer and Plan Administrator have delegated to MetLife and MetLife has agreed to assume the responsibility and discretionary authority for providing the full and fair review of determinations concerning eligibility for Plan Benefits and the interpretation of Plan terms in connection with the appeal of Claims denied in whole or in part, required under ERISA Section 503 and, therefore, MetLife is the Named ERISA Claims Review Fiduciary. Any determination or interpretation made by MetLife pursuant to this discretionary authority shall be given full force and effect and be binding on the Participant, Customer and Plan Administrator unless it is demonstrated that the determination was arbitrary and capricious.

(ASA at 7, Admin. Record at 13.) Thus, the challenged denials in this case, both initially and on administrative appeal, were made by Defendant pursuant to its authority granted under the Plan and corresponding ASA.

## C.    The Processing and Denial of Plaintiff's Claim for Disability Benefits

Plaintiff applied for disability benefits on January 10, 2002, describing the nature of her disability as "panic attacks," and stating that this condition was not work-related. (Admin. Record at 60.) Dr. Lingnurkar filled out a portion of this application in support of Plaintiff's claim for benefits, stating that the "severity of [Plaintiff's] panic attacks interfere[s] with [her] ability to do [her] job and interact with coworkers and customers." (Id. at 61.) Dr. Lingnurkar opined that this condition was not a result of Plaintiff's employment, that Plaintiff had been totally disabled from her job since December 23, 2001, and that she would be able to return to work on or around February 28, 2002. (Id.)

On January 28, 2002, Defendant wrote to Dr. Lingnurkar to inquire about Plaintiff's condition and ask for copies of her medical record. Dr. Lingnurkar responded

8

in a letter dated February 9, 2002, accompanied by the records of Plaintiff's several office visits between November 28, 2001 and February 8, 2002. (See Admin. Record at 69-78.) Apparently, however, the case manager who was handling Plaintiff's claim did not immediately receive these records, as this case manager indicated in a February 19, 2002 telephone conversation with Plaintiff that Defendant had only a single office note from Dr. Lingnurkar dated January 10, 2002, and that it appeared that Plaintiff "was not seen very frequently for therapy." (Id. at 53-54.) This problem evidently was soon rectified, however, as Defendant's claim processing records indicate that Dr. Lingnurkar's records were received and reviewed on February 20, 2002. (See id. at 54.)

On March 8, 2002, Defendant forwarded Plaintiff's claim file for review by Dr. Bettina Kilburn, a psychiatrist. Dr. Kilburn's resulting report cites various indicia in Dr. Lingnurkar's records that Plaintiff had experienced "significant work setting related difficulties." (Id. at 82.) The report then summarizes Dr. Lingnurkar's notes of Plaintiff's office visits as "primarily reflect[ing] the claimant's self-reported complaints," and as lacking any "documented objective Mental Status Exam with specific findings, Mini Mental Status Exam, or other testing." (Id. at 83.) Dr. Kilburn's report concludes:

> The available documentation does not give evidence of record that the claimant has a significant, observable, measurable, global psychiatric impairment precluding the performance of tasks of her own occupation. The AP's [*i.e.,* attending physician, Dr. Lingnurkar] office visit notes indicate that the AP requested that the patient be off work following an incident with a manager/supervisor. Much of the documentation refers to the claimant's specific work-setting difficulties; the AP has recommended that the claimant seek another job or go to a different store if she remains with her current employer. It appears that work-setting difficulties, rather

9

> than a defined occupational task impairment, are the most significant issues. The available documentation does not contain objective Mental Status Exam finding which would substantiate significant psychiatric functional impairment.  Also, according to an Attending Physician Statement completed by the AP on 1/10/02, the major obstacle to the patient returning to work is the severity of her panic attacks; the panic attacks are solely self-reported symptoms without objective substantiation.

(Id.)  Based on this report, Defendant denied Plaintiff's claim for benefits on March 13, 2002.

On August 12, 2002, Plaintiff commenced an administrative appeal of this denial in accordance with the terms of the Plan.  By letter dated August 15, 2002, Defendant informed Plaintiff that it had completed its review and determined that she was not eligible for long term disability benefits.  (See id. at 88.)  In Defendant's view, Plaintiff's medical records indicated that "the work-setting, rather than psychological impairments[,] are the issues that are precluding you[] from performing your occupational requirements." (Id.)  Accordingly, Defendant concluded that "[t]here is no medical evidence to support the severity of a disabling condition beyond January 25, 2002," the date Plaintiff would have first been eligible for long term disability benefits.  (Id.)  Plaintiff was advised, however, that she could pursue a further appeal within 180 days after receiving this August 15, 2002 denial letter.

Plaintiff promptly initiated this second-level administrative appeal, and Defendant referred her claim file for review by a second psychiatrist, Dr. Ernest Gosline.  In conducting this review, Dr. Gosline stated that he had considered "[a]ll information provided in the record including the medical disability claim statement signed 01/18/02,

and also the Attending Physician Statement signed 01/10/02 by Dr. Lingnurkar,

psychiatrist," which in turn established "the following dates of treatment . . . : 11/28,

12/05, 12/26/01 and 01/10/02."  (Id. at 90.)

Dr. Gosline then opined that the record provided for his review did not establish

Plaintiff's inability to perform her job:

> In reviewing the job description which has been provided, the
> description does indicate a person who does need to meet customers, but
> also does a great deal of work doing things for the store, such as receives
> shipment and general maintenance, and does not actually involve a great
> deal of interaction with other personnel or customers.  The only information
> that has been provided from her treating psychiatrist is the original form
> that was dated January 10.  An Issues letter was sent to Dr. Lingnurkar on
> January 28, 200[2], asking for more specific information and no answer has
> been received as far as this information is concerned.
>
> In view of the limited documentation for a psychiatric condition, I
> would consider the information provided beyond January 10 as totally
> inadequate to make a determination as to [Plaintiff's] ability to perform the
> duties of her own occupation.  What is missing from the documentation is
> DSM-IV complete diagnosis in all five axes, Mental Status Examination,
> prognosis, plan of treatment or any indication as to what treatment is
> actually going on if any.  For this reason I cannot find adequate clinical
> documentation to substantiate [Plaintiff's] inability to perform the duties of
> her own job through a global impairment from a psychiatric condition.

(Id. at 90-91.)  Citing Dr. Gosline's review of the medical record, Defendant notified

Plaintiff on September 19, 2002 that its original denial of her claim for benefits had been

upheld on administrative appeal.  (See id. at 92-93.)

Following this unfavorable disposition of her second-level administrative appeal,

Plaintiff now seeks judicial review of Defendant's denial of her claim for long term

disability benefits.  Both sides have moved for judgment in their favor — Plaintiff seeks

11

to overturn Defendant's denial of benefits, while Defendant asks that its decision be affirmed.

### III.  CONCLUSIONS OF LAW

**A.     The Standards Governing  the Parties' Cross-Motions**

A participant or beneficiary of an ERISA qualified plan may bring suit in federal district court to recover benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  Courts review *de novo* a denial of benefits challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996).

Here, the parties agree that the "arbitrary and capricious" standard governs the Court's review, in light of the Plan provisions that expressly grant Defendant the discretionary authority to determine eligibility for disability benefits and to construe the terms of the Plan.  This standard is the "least demanding form of judicial review," under which this Court must uphold a denial of benefits if it is "rational in light of the plan's provisions."  Monks v. Keystone Powdered Metal Co., 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal quotation marks and citations omitted), aff'd, 2001 WL 493367 (6th Cir. May 3, 2001).  "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  Davis v.

12

Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citations omitted), cert. denied, 495 U.S. 905 (1990). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." Marchetti v. Sun Life Assurance Co., 30 F. Supp.2d 1001, 1008 (M.D. Tenn. 1998).

Nonetheless, Plaintiff argues that the Court's application of this deferential standard of review should be tempered somewhat by the existence of a purported conflict of interest. As this Court has elsewhere explained, while a plan administrator's possible conflict of interest does not warrant the outright abandonment of the "arbitrary and capricious" standard in favor of de novo review, this possible conflict "should be taken into account as a factor in determining whether the [administrator's] decision was arbitrary and capricious." Monks, 78 F. Supp.2d at 657 (internal quotation marks and citations omitted); see also Wells v. United States Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1247 (6th Cir. 1991).

Here, however, Plaintiff has failed to identify any factual predicate for the existence of a conflict of interest. First, she erroneously asserts that Defendant "both determines eligibility for benefits and is responsible for paying benefits." (Plaintiff's Motion, Br. in Support at 11.) In fact, the Plan is self-funded, and Defendant pays benefits by drawing from an account established by the Plan sponsor, The Limited, Inc. Next, Plaintiff suggests that the two physicians who assessed her medical records during

13

the claim review process were in Defendant's employ or otherwise had some sort of

interest or stake in the outcome of her claim.  Again, however, there is no evidence that

casts doubt upon Defendant's characterization of these physicians as "independent

consultants," or that otherwise suggests some form of bias or incentive to reach a

particular conclusion.  See Kalish v. Liberty Mutual/Liberty Life Assurance Co., 419 F.3d

501, 508 (6th Cir. 2005) (adhering to ordinary "arbitrary and capricious" review where

the plaintiff "offered only conclusory allegations of bias" on the part of the independent

physician retained by the defendant plan administrator to review the medical record).

Thus, the Court discerns no need here to account for any potential conflict of interest.

Finally, in reviewing Defendant's decision, the Court is "confined to the record

that was before the Plan Administrator," and "may not admit or consider any evidence not

presented to the administrator."  Wilkins, 150 F.3d at 615, 619.  The pertinent record,

however, is not limited solely to the evidence before the administrator at the time of its

initial decision, but also includes materials considered during the administrative appeals

process.  Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991).

**B.     Defendant's Denial of  Long Term Disability Benefits Was Arbitrary and
        Capricious, in Light of Its Disregard of Portions of the Medical Record.**

With the above standards in mind, the Court now turns to the benefit denial at

issue here.  While Plaintiff suggests that Defendant's decisionmaking process was flawed

in several respects, the Court finds it necessary to address only one of these purported

defects.  Specifically, Plaintiff contends, and the Court agrees, that the benefit denial at

14

issue here was impermissibly based on only a subset, and not the entirety, of the pertinent medical record.  As Plaintiff correctly observes, a decision reached under such circumstances is properly deemed "arbitrary and capricious" under controlling Sixth Circuit precedent.

In particular, Plaintiff relies principally upon the decision in Spangler v. Lockheed Martin Energy Systems, Inc., 313 F.3d 356 (6th Cir. 2002).  In that case, the defendant claims administrator, Metropolitan Life, retained an outside vocational consulting company to determine whether plaintiff Janice Spangler was capable of performing sedentary work.  Yet, despite a wealth of medical records compiled during the course of Spangler's ongoing treatment for a back condition, Met Life provided the vocational consultant only a single document in which one of Spangler's physicians assessed her present condition and limitations.  Based solely upon this one assessment, the consultant determined that Spangler could perform sedentary work, and Met Life relied almost exclusively upon this determination in denying Spangler's claim for disability benefits.

The district court upheld Met Life's denial of benefits under the "arbitrary and capricious" standard, but the Sixth Circuit reversed.  In so ruling, the Court observed that the lone physician's assessment provided to the outside consultant was "somewhat aberrant," as the remaining reports and statements provided by the same physician "clearly indicate[d] that Spangler [wa]s not able to perform any work."  Spangler, 313 F.3d at 362.  Under these circumstances, the Court found that Met Life had impermissibly "'cherry-picked' [Spangler's] file in hopes of obtaining a favorable report from the

15

vocational consultant as to Spangler's ability to work." 313 F.3d at 362. The Sixth

Circuit held that Met Life's action in this regard was "arbitrary and capricious," as the

claims administrator "should have provided [the vocational consultant] with all of the

medical records relevant to Spangler's capacity to work." 313 F.3d at 362; see also Moon

v. Unum Provident Corp., 405 F.3d 373, 381 (6th Cir. 2005) (finding that a denial of long

term disability benefits was arbitrary and capricious in light of the defendant insurer's

"selective review of the administrative record").

Plaintiff contends that the challenged benefit denial in this case suffers from a

similar defect. She points, in particular, to the review conducted by Defendant's retained

medical consultant, Dr. Ernest Gosline, during her final administrative appeal. In

summarizing his review, Dr. Gosline cited Dr. Lingnurkar's January 10, 2002 attending

physician statement as "[t]he only information that has been provided from [Plaintiff's]

treating physician." (Admin. Record at 90.) Dr. Gosline further stated that Dr.

Lingnurkar was asked to submit "more specific information," but that he apparently had

not done so. (Id.) Thus, it appeared to Dr. Gosline that Plaintiff's treating psychiatrist

had neither conducted a mental status examination nor provided a "DSM-IV complete

diagnosis in all five axes." (Id. at 90-91.) In light of this "limited documentation" of

Plaintiff's psychiatric condition, Dr. Gosline opined that the medical record was "totally

inadequate to make a determination as to [Plaintiff's] ability to perform the duties of her

own occupation." (Id. at 90.)

Just as in Spangler, Defendant here failed to produce the entire record for review

16

by its retained consultant.  Plaintiff was seen by Dr. Lingnurkar on six different occasions between late November of 2001 and early February of 2002, and the psychiatrist's treatment notes reflect a diagnosis on the DSM-IV five-axis scale for each of these six visits.  (See id. at 72-78.)  In addition, the record of Plaintiff's November 28, 2001 visit discloses that Dr. Lingnurkar conducted a mental status examination on that date.  (See id. at 73.)  Moreover, while Dr. Gosline states that Dr. Lingnurkar apparently failed to respond to a request for additional information, Defendant's own records establish that Plaintiff's physician provided the requested information on or before February 20, 2002.  (See id. at 54, 69-71.)

It is evident, then, that Defendant gave Dr. Gosline only a small portion of the medical documentation it had compiled regarding Plaintiff's psychiatric condition.  What is worse, the most pertinent portions of the medical record — namely, Dr. Lingnurkar's treatment notes, recounting his examinations, observations, and diagnoses — were altogether omitted.  Whether this resulted from deliberate "cherry-picking" or mere inadvertence, the fact remains that Dr. Gosline's assessment was based on a woefully incomplete record.[2]  It follows that Defendant's denial of Plaintiff's administrative

---

[2]It appears that this record also might have been incomplete in another respect.  In his report, Dr. Gosline states that he was provided with a "job description" for Plaintiff's position as assistant sales manager, and that it appeared from this document that this job "does not actually involve a great deal of interaction with other personnel or customers." (Id. at 90.)  Yet, the only document in the record that appears to match Dr. Gosline's description purports to list only the **physical demands** of an assistant sales manager, versus the overall job duties performed in this position.  (See id. at 64-65.)  Since this document says nothing whatsoever about sales or customers, the Court doubts that it is meant to be a complete "job description" for the position of assistant sales manager — a position which presumably entails a fair amount of customer

appeal, which rested almost exclusively upon Dr. Gosline's assessment, (see id. at 92-93), was the product of a flawed claim review process.

Moreover, Defendant's actions in the earlier stages of the administrative process do nothing to quell this concern. To the contrary, it appears that the first physician consultant retained by Defendant, Dr. Bettina Kilburn, might also have been working with a less-than-complete record. Dr. Kilburn states, for example, that Dr. Lingnurkar's "office visit notes primarily reflect [Plaintiff's] self-reported complaints," and that "[t]here is no documented objective Mental Status Exam with specific findings, Mini Mental Status Exam, or other testing." (Id. at 83.) As noted, however, Dr. Lingnurkar's notes from Plaintiff's first office visit on November 28, 2001 reflect that a mental status examination was performed on that date. While Dr. Kilburn perhaps might have felt that Dr. Lingnurkar's testing was deficient in some respect, or that his findings might not have established a "disability" within the meaning of the Plan, it is simply inaccurate to assert that Plaintiff's treating physician conducted no "testing" and made no objective "findings" whatsoever.[3]

Nor can it be said with any degree of confidence that these defects in Defendant's claim review process were immaterial to the ultimate denial of Plaintiff's claim for

---

interaction.

[3]The Court further notes that, so far as can be gleaned from the administrative record, neither of the two physician consultants retained by Defendant was informed about or provided with the pertinent records of Plaintiff's February 25, 2002 visit to an emergency room for treatment of an apparent anxiety attack.

18

disability benefits. See Spangler, 313 F.3d at 362 (noting the possibility that "discrete acts by the plan administrator" might be arbitrary and capricious, but that the administrator's "ultimate decision denying benefits" might not be). Most significantly, Defendant relied heavily, if not exclusively, upon the opinions of its physician consultants in explaining why Plaintiff was deemed ineligible for disability benefits. (See Admin. Record at 55, 88 (mimicking the language of Dr. Kilburn's report); id. at 92 (citing Dr. Gosline's assessment).) Plainly, then, these opinions played a significant role in Defendant's decisionmaking process.

Moreover, Defendant's underlying reasoning for its claim denial, as expressed during the administrative process and in its submissions to this Court, depends heavily upon the views of its two retained physician consultants. The lynchpin of this reasoning is that Plaintiff's difficulties arose from her particular work setting, rather than a more fundamental psychological impairment that would have precluded her from performing her job duties in a more favorable environment. As noted by Plaintiff, this determination runs directly counter to at least certain aspects of the medical opinion of her treating physician, Dr. Lingnurkar. In particular, Dr. Lingnurkar stated in his January 10, 2002 attending physician statement that the severity of Plaintiff's panic attacks interfered with her ability to do her job and to interact with coworkers and customers, (see id. at 62) — tasks which, as noted earlier, a worker in an assistant sales manager's position presumably must be able to perform. Dr. Lingnurkar also opined in this same statement that Plaintiff's condition was not a result of her employment. (See id.) Thus, to accept

19

Defendant's reasoning for its denial of benefits, one necessarily must reject these aspects, at least, of Dr. Lingnurkar's assessment of Plaintiff's medical condition.

Defendant did so in explicit reliance on the record reviews conducted by Drs. Kilburn and Gosline. In particular, Dr. Kilburn opined, in direct contravention to Dr. Lingnurkar's stated view, that Plaintiff appeared to be suffering from "work-setting difficulties" rather than "a defined occupational task impairment." (Id. at 83.)[4] To be sure, Defendant correctly observes that it need not "automatically . . . accord special

_____

[4]Interestingly, in reaching this conclusion, Dr. Kilburn cited portions of Dr. Lingnurkar's treatment notes in which he recommended that Plaintiff consider relocating to a different Victoria's Secret store or seeking another job altogether. Dr. Kilburn viewed these passages as evidence of Plaintiff's ability to perform her job duties, at least in a more amenable work setting.

Dr. Kilburn's reliance on these aspects of Dr. Lingnurkar's records, while rejecting other aspects, appears problematic in a number of respects. First, there is no inherent conflict between Dr. Lingnurkar's medical assessment that Plaintiff could not perform the duties of her job, on the one hand, and his advice, on the other hand, that "*if* [Plaintiff] decides to go back with Victoria['s Secret] then she should go to a different store." (Id. at 77 (emphasis added).) Assuming that a patient with a panic disorder is determined to attempt a return to work, it would appear to be sound advice to recommend a work environment free from the elements that triggered the patient's past panic attacks. Such advice does not necessarily reflect, one way or the other, the physician's medical judgment as to whether such an attempted return to work is likely to succeed. Similarly, Dr. Lingnurkar's terse recommendation that Plaintiff seek another job says little or nothing about his view as to the types of work Plaintiff could perform or her likelihood of success in another position. This distinction is crucial, because an employee is "disabled" under the Plan if she is "unable to perform all duties related to [her] job," regardless of whether she might be able to carry out the duties of some other position.

Finally, the Court finds it noteworthy that Defendant and its physician consultant would accept an aspect of Dr. Lingnurkar's treatment notes that reflects, in essence, a vocational judgment about Plaintiff's ability to perform in a different work setting, while discounting his medical judgment as to the severity of Plaintiff's psychological impairment. Surely, Dr. Lingnurkar's expertise lies more in the latter than the former area. Indeed, given Defendant's rejection of Dr. Lingnurkar's medical opinion as based upon insufficient testing and objective findings, it seems rather disingenuous to affirmatively cite and rely upon his suggestions that Plaintiff consider relocating to a different store or finding a new job.

20

weight to the opinions of a claimant's physician," nor does it bear "a discrete burden of explanation" for "credit[ing] reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003).  Nonetheless, Defendant "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Nord, 538 U.S. at 834, 123 S. Ct. at 1972.  As discussed earlier, the refusal here must be deemed arbitrary, as it rests upon the views of physician consultants who either were provided with an incomplete record or overlooked material portions of this record.

It remains only to determine the appropriate remedy for Defendant's arbitrary denial of Plaintiff's claim.  Compare University Hospitals v. Emerson Electric Co., 202 F.3d 839, 852 & n.13 (6th Cir. 2000) (remanding for further administrative proceedings where the plan administrator failed to reach an issue necessary to determine the propriety of an award of benefits) with Williams v. International Paper Co., 227 F.3d 706, 715 (6th Cir. 2000) (finding it "appropriate to retroactively grant disability benefits without remanding the case where there are no factual determinations to be made").  See generally Cook v. Liberty Life Assurance Co., 320 F.3d 11, 24-25 (1st Cir. 2003) (citing various factors for a court to consider in deciding whether to award benefits or remand to the administrator); Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 476-78 (7th Cir. 1998) (same).  The deficiency in Defendant's claim processing here was the failure of its physician consultants to properly consider the entirety of the medical record in arriving at their opinions that Plaintiff was not disabled.  Yet, the Court is unable to say whether Dr.

21

Lingnurkar's records, if reviewed in their totality, would dictate an award of disability benefits under the terms of the Plan.

To be sure, Plaintiff's treating physician opined on at least one occasion that Plaintiff's panic attacks interfered with her ability to perform her job. It is still open to dispute, however, whether Dr. Lingnurkar's opinion on this point was adequately supported by appropriate testing, objective findings, and relevant diagnostic measures. In answering this question in the negative, Defendant's physician consultants relied upon a record that was manifestly incomplete in certain material respects. Whether they would reach the same conclusion under a complete record is a matter that should be addressed by Defendant in the first instance through further administrative proceedings. See University Hospitals, 202 F.3d at 852 & n.13; Quinn, 161 F.3d at 477-78 (noting that the plan administrator's decision in that case "was arbitrary and capricious, but not necessarily wrong").

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's Motion to Reverse Plan Administrator's Decision to Deny Long Term Disability Benefits is GRANTED IN PART, with this case to be REMANDED for further administrative consideration of Plaintiff's claim for benefits. IT IS FURTHER ORDERED that Defendant's Motion to Affirm the Administrator's Determination is DENIED.

22

Dated:  October 18, 2005

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 19, 2005, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

23